## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RUTH C. MITCHELL,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14cv00046** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

### I. Background and Standard of Review

Plaintiff, Ruth C. Mitchell, ("Mitchell"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Mitchell has requested oral argument in this matter.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mitchell protectively filed her application for DIB on October 14, 2011, alleging disability as of April 1, 2006, due to agoraphobia, anxiety, depression, polycythemia,[1] hypertension, nerves, skin rash eczema, synovial cysts on the spine and herniated discs at the L4-L5 level of the spine. (Record, ("R."), at 183-84, 188, 192, 211, 219.) The claim was denied initially and on reconsideration. (R. at 91-93, 97-99, 102, 103-05, 107-09.) Mitchell then requested a hearing before an administrative law judge, ("ALJ"), (R. at 110), and a hearing was held by video conferencing on July 23, 2013, at which Mitchell was represented by counsel. (R. at 29-70.)

By decision dated August 8, 2013, the ALJ denied Mitchell's claim. (R. at 12-24.) The ALJ found that Mitchell met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2007.[2] (R. at 14.) The ALJ also found that Mitchell had not engaged in substantial gainful activity since April 1, 2006, her alleged onset date. (R. at 14.) The ALJ found that the

---

[1] Polycythemia refers to an increase in the total red cell mass of the blood. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1330 (27th ed. 1988).

[2] Therefore, in order to be eligible for DIB benefits, Mitchell must show that she was disabled between April 1, 2006, the alleged onset date, and December 31, 2007, the date last insured.

-2-

medical evidence established that Mitchell suffered from severe impairments, namely polycythemia; chronic obstructive pulmonary disease, ("COPD"); depression; and anxiety, but she found that Mitchell did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ found that Mitchell had the residual functional capacity to perform a range of light work,[3] which did not require more than occasional climbing, balancing, stooping, kneeling, crouching and crawling, and which did not require more than occasional social interaction. (R. at 16-21.) The ALJ found that, through the date last insured, Mitchell was able to perform her past relevant work as an accounting clerk. (R. at 21-22.) Based on Mitchell's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that jobs existed in significant numbers in the national economy that Mitchell could perform, including jobs as an assembler, a packer and an inspector. (R. at 22-23.) Thus, the ALJ found that Mitchell was not under a disability as defined by the Act and was not eligible for DIB benefits through her date last insured. (R. at 23.) *See* 20 C.F.R. § 404.1520(f),(g) (2015).

After the ALJ issued her decision, Mitchell pursued her administrative appeals, (R. at 7), but the Appeals Council denied her request for review. (R. at 1-5.) Mitchell then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Mitchell's motion for summary judgment filed June 15, 2015, and the Commissioner's motion for summary

_____

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

-3-

judgment filed July 20, 2015.

## II. Facts

Mitchell was born in 1955, (R. at 183), which, at the time of the ALJ's decision, classified her as a "person of advanced age" under 20 C.F.R. § 404.1563(e). She has a high school education and two years of college instruction. (R. at 193.) Mitchell has past relevant work experience as an office manager in a dentist's office and as a dental hygienist. (R. at 31-32, 193.)

Mitchell testified at her hearing that she last worked as dental receptionist/office manager/bookkeeper in April 2002. (R. at 44-45.) However, she stated that she left that job due to her nerves and increasing difficulty being around people and dealing with the public. (R. at 38, 45.) Mitchell stated that her "nerves" were treated by her primary care physician. (R. at 38.) She stated that she was agoraphobic, sometimes requiring her to cancel medical appointments because she could not go out. (R. at 33-34.) She stated that the only place she felt safe was at home. (R. at 35.) Mitchell testified that in 2006 and 2007, she simply "stopped socially." (R. at 41.) She stated that she did not want company unless announced, and she did not enjoy people anymore. (R. at 41.) Mitchell testified that she did not leave the house to grocery shop and had not been to Walmart "in years." (R. at 41.) She stated that she last time she had been shopping was "probably three years ago." (R. at 41.) Mitchell testified that she might go into the Dollar Store if she was going to the doctor and was able to do so. (R. at 41.) She stated that her neighbor cut her hair, she did not attend church, and she did not go out to dinner. (R. at 41-42.) Mitchell estimated that she had not eaten out since

-4-

2003. (R. at 42.) She testified that she did not drive, and was not doing so in 2006 or 2007, due to her back problems and panic attacks, unless her husband was unavailable, in which case she only to drove to and from medical appointments. (R. at 43-44.)

Mitchell testified that she began having back pain in 2006, resulting in difficulty getting up and down by herself, difficulty standing and limited physical activity. (R. at 47-48.) She stated that she had seen an orthopedic doctor for her back and had taken Lortab for back pain for the previous five or six years. (R. at 38-39.) She stated that Lortab alleviated some of her pain, and she admitted that her pain was worse when she did not take it. (R. at 40.) Although Mitchell testified that her conditions worsened in January 2012, she stated that she refused to see a neurosurgeon, contrary to her physician's advice in January 2013, because she "[does not] travel" due to her back and her nerves. (R. at 34-35, 38.) Mitchell did treat with Blue Ridge Neuroscience Center, P.C., in April 2011, but did not follow through with the recommendation for physical therapy. (R. at 39.) She testified that she did not file for disability until October 2011, despite an alleged onset date of April 1, 2006, because she thought she could "overcome" it, and she was embarrassed and did not want to "give in to it." (R. at 34.)

Mitchell stated that her husband did the laundry and cooked. (R. at 48.) She stated that she could make crockpot meals, but had to sit down for at least 20 minutes due to lower back pain. (R. at 48-49.) She also testified that she had to lie down throughout the day and sit in a recliner with her feet up. (R. at 49.) Mitchell testified that her husband did the grocery shopping in December 2007. (R. at 51.) She described a typical day in December 2007 to include simply staying home. (R.

-5-

at 51.)  She stated that she had to move from one point to another just to get comfortable.  (R. at 52.)  Mitchell testified that, in December 2007, she went to bed around 10:30 p.m. and would sleep for six or seven hours on Flexeril.  (R. at 52.)  After getting up, she would make a cup of coffee and proceed to alternate from spending time in a recliner and lying back down.  (R. at 53.)  She stated that she did not eat breakfast or lunch, and she would have dinner with her husband around 5:00 p.m.  (R. at 53-54.)  Mitchell testified that she would continue alternating positions after dinner.  (R. at 54.)  She stated that she would plant flowers when she could, but her husband brought her the dirt.  (R. at 51.)  She further testified that she had not taken a vacation since 2003.  (R. at 52.)

John Newman, a vocational expert, also was present and testified at Mitchell's hearing.  (R. at 55-68.)  Newman characterized Mitchell's past work as a dental receptionist as sedentary[4] and semi-skilled, as a bookkeeper as sedentary and skilled and as a dental assistant as light and skilled.  (R. at 55-56.)  As an aggregate assessment, Newman characterized Mitchell's work as a dental assistant at the dentist's office as light and skilled.[5]  (R. at 56.)  When asked to consider a hypothetical individual who could perform light work that required no more than occasional climbing of ramps, stairs, ladders, scaffolds and ropes and no more than occasional crouching and crawling, Newman testified that such an individual could perform Mitchell's past work as a dental assistant.  (R. at 57-58.)  Newman further

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. § 404.1567(a) (2015).

[5] Newman testified that the final Dictionary of Occupational Titles, ("DOT"), classification that was relevant was "dental assistant," found at 079.361-018.  (R. at 58.)

testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a receptionist, a telephone order clerk and an accounting clerk, all classified as sedentary. (R. at 58-59.) Newman also testified that such an individual could perform the jobs of a cashier, an amusement or recreational attendant and a counter clerk, all at the light level of exertion. (R. at 61.) Newman testified that all of the jobs listed, except for the accounting clerk job, required dealing with the public. (R. at 64-65.) He stated that, if a hypothetical individual was unable to deal with the public due to fear, anxiety and panic, requiring a retreat from the environment, she would not be able to perform those jobs. (R. at 65.) Newman testified that the accounting clerk job probably would require an individual to sit for a minimum of six hours in an eight-hour day, and if a hypothetical individual was not able to do so due to back pain or was required to shift and change positions throughout the day for at least 15 to 20 minutes at a time, the individual would not be able to perform that job or any other sedentary job. (R. at 65-66.) Newman further testified that if a hypothetical individual had to sit in a position to recline or prop up her feet at least waist-high or higher, such individual could not perform those sedentary jobs or any other jobs. (R. at 66.) Newman was next asked to consider a hypothetical individual with no exertional limitations, but who could have no more than occasional social interaction. (R. at 67.) He testified that such an individual could not perform Mitchell's past work, but could perform the job of the accounting clerk, as well as the jobs of an assembler, a laundry folder and an inspector/tester/sorter, at the light level of exertion. (R. at 67.) Lastly, when asked to consider a hypothetical individual who could perform light work that required no more than occasional climbing of ramps, stairs, ropes, ladders and scaffolds, no more than occasional crouching and crawling and which required no more than occasional social

-7-

interaction, Newman testified that such an individual could perform the jobs just listed.  (R. at 68.)

In rendering her decision, the ALJ reviewed medical records from Wellmont Lonesome Pine Hospital; Dr. Joseph Duckwall, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; James Wickham, a state agency consultant; Richard Luck, Ph.D., a state agency psychologist; Dr. Lawrence J. Fleenor, M.D.; Solstas Lab Partners; Blue Ridge Neuroscience Center, P.C.; Dermatology Associates; Medical Associates of Big Stone Gap; and Wellmont Medical Associates.

Mitchell saw Dr. Lawrence J. Fleenor, M.D., from November 28, 2001, through November 19, 2011.  Over this time, Dr. Fleenor treated Mitchell for anxiety, depression, agoraphobia, polycythemia, spinal stenosis, right sacroiliac, ("SI"), joint arthritis and low back syndrome, among other things.  (R. at 268-366, 370-95, 422-53.)  With regard to her psychological impairments prior to April 1, 2006, Dr. Fleenor treated Mitchell's depression and anxiety with agoraphobic symptoms conservatively with Zoloft, Serax, Librax and Lexapro.  (R. at 268-69, 271-72, 274, 277, 279, 281, 283-84, 288.)  On December 12, 2001, Mitchell reported doing better, and Dr. Fleenor stated that she showed dramatic improvement.  (R. at 269.)  On January 9, 2002, she reported doing some better. (R. at 269.)  By February 13, 2002, her nerves were "good."  (R. at 270.)  On April 24, 2002, Mitchell reported significant emotional stress, she had sweaty palms and was tremulous.  (R. at 271.)  On May 29, 2002, Mitchell's nerves were fair,[6] and

---

[6] It is difficult to decipher from the handwritten notes whether Mitchell stated that she was doing "fair" or "fine."

-8-

Dr. Fleenor increased her dosage of Zoloft. (R. at 271.) By July 30, 2002, she reported that this increased dosage helped, but she described herself as a social recluse. (R. at 272.) On December 12, 2002, Mitchell continued to report doing fair. (R. at 273.) On March 11 and June 16, 2003, Mitchell stated that her nerves were good. (R. at 276-77.) On September 19, 2003, Dr. Fleenor deemed her conditions stable. (R. at 277.)

On February 6, 2004, Mitchell reported that she had been out of her medication for a week and was agoraphobic. (R. at 274.) Dr. Fleenor prescribed Lexapro, and by March 12, 2004, Mitchell reported feeling calmer and not as worried. (R. at 275.) She again reported feeling better on April 8, 2004. (R. at 280.) On August 11, 2004, Mitchell stated that she felt well. (R. at 283.) On September 10, 2004, she reported feeling well, and she conveyed no concerns. (R. at 283.) On November 12, 2004, Mitchell stated that she was doing fine, and she was continued on Lexapro. (R. at 284.) On January 12, 2005, she continued to do fine. (R. at 285.) By September 19, 2005, Mitchell complained of increased agitation, irritability and reclusivity, but admitted she had stopped taking Lexapro. (R. at 286.) She requested more Serax. (R. at 286.) On October 31 and November 30, 2005, Mitchell reported doing fine and feeling well. (R. at 287.) By January 25, 2006, she stated that she did not feel well and asked to resume Lexapro, which Dr. Fleenor prescribed. (R. at 288.) By March 1, 2006, Mitchell reported that the Lexapro helped. (R. at 289.)

With regard to Dr. Fleenor's treatment of Mitchell during the relevant time period, she reported on August 18, 2006, that she was reclusive, agoraphobic and hypomanic. (R. at 290.) On November 18, 2006, she stated that she was doing

-9-

fair, but noted that her depression was worse and that she was reclusive and agoraphobic. (R. at 291.) Dr. Fleenor noted a visible tremor. (R. at 291.) He discontinued Lexapro and prescribed Cymbalta. (R. at 291.) However, on December 2, 2006, Mitchell reported that she felt no different, so he increased her dosage of Cymbalta to 60 mg. (R. at 292.) By March 16, 2007, Mitchell reported that her depression was improving with this increased dosage, which Dr. Fleenor continued. (R. at 292-93.) On March 23, 2007, Mitchell again reported that her depression was doing better, and on May 19, 2007, she stated that she really liked how she felt. (R. at 294.) On July 18 and October 22, 2007, she reported doing fair on Cymbalta. (R. at 296-97.) Mitchell noted a fear of leaving her home, but she noted decreased depressive symptoms. (R. at 297.)

Dr. Fleenor continued to treat Mitchell's psychological impairments after the expiration of her date last insured. On February 15 and May 14, 2008, Mitchell's diagnoses and medications remained unchanged, and on July 9, 2008, she reported doing fair. (R. at 298-99.) On October 24, 2009, Mitchell stated that she was doing "alright," but on July 13, 2011, she reported feeling agitated. (R. at 442.) When Mitchell presented to the emergency department at Wellmont Lonesome Pine Hospital, ("Lonesome Pine"), on March 15, 2011, with complaints of dizziness and near syncope, she was treated by Dr. Fleenor. (R. at 370-82.) Despite being described as anxious, to varying degrees, she was fully oriented and cooperative. (R. at 374, 376, 379.) Mitchell saw Dr. Fleenor one last time on November 19, 2011, at which time he continued to diagnose her with agoraphobia. (R. at 449.)

On October 21, 2011, Dr. Fleenor completed a mental assessment of

-10-

Mitchell, finding that she had a seriously limited ability to understand, remember and carry out simple, detailed and complex job instructions and to maintain personal appearance, and no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 451-53.) He further found that she would be absent from work more than two days monthly due to her impairments or treatment. (R. at 453.) Dr. Fleenor based his findings on Mitchell's chronic depression, agoraphobia, hypomania, lethargy, expected alcohol abuse and known cigarette abuse. (R. at 451.) In a letter to Mitchell's counsel, dated October 21, 2011, Dr. Fleenor stated that her primary diagnoses were depression, hypertension, chronic obstructive lung disease, secondary polycythemia and low back syndrome. (R. at 450.) He opined that Mitchell's prognosis for recovery, particularly from her dominating emotional difficulties, was poor. (R. at 450.) Dr. Fleenor further opined that Mitchell was disabled from gainful employment long before April 1, 2006, and continued to be so disabled. (R. at 450.)

With regard to Mitchell's physical impairments, the record reveals that Dr. Fleenor treated her for hypertension, polycythemia and low back problems. However, because Mitchell's argument on appeal focuses mainly on her low back problems, in relation to her physical impairments, the court also will focus its attention on the notes pertaining thereto. At the outset, the court notes that there are no treatment records from the relevant time period relating to Mitchell's low back problems. The first mention of back problems was on September 6, 2008,

-11-

when Mitchell reported falling two weeks previously and hurting her back, causing back pain which radiated into her leg. (R. at 299-300.) She received a Depomedrol injection. (R. at 300.) On September 29, 2008, she had pain on pressure to the caudal SI joint. (R. at 300.) Dr. Fleenor diagnosed right SI joint arthritis, and he administered a Toradol injection. (R. at 301.) On November 15, 2008, Mitchell had pronounced lower back pain with sciatica, and she was diagnosed with low back syndrome. (R. at 302.) Dr. Fleenor prescribed Lortab, and he ordered an MRI of the lumbosacral spine. (R. at 302.) This MRI, dated December 5, 2008, showed spinal stenosis at the L4-L5 level due to a bulging annulus and hypertrophy of the posterior facet joints. (R. at 475-76.) There also was a synovial cyst at the right facet joint, causing some additional compression to the exiting spinal nerve on the right side. (R. at 476.) Facet joint arthrosis was noted at all lumbar levels, and there was an arachnoid cyst in the sacral canal. (R. at 476.) On December 13, 2008, Dr. Fleenor diagnosed Mitchell with spinal stenosis, herniated discs and spinal cysts, among other things, and on April 18, 2009, he diagnosed spinal stenosis. (R. at 303, 430.)

Mitchell returned to Dr. Fleenor on June 20, 2009, and was continued on her medications. (R. at 431.) On October 24, 2009, she reported doing "alright." (R. at 432.) Mitchell's conditions remained essentially unchanged through February 22, 2011. (R. at 439.) By March 25, 2011, she reported severe low back pain, but stated that she was feeling "so much better." (R. at 440.) Dr. Fleenor continued to diagnose low back syndrome. (R. at 440.) On September 19, 2011, Mitchell stated that she was managing her back pain and radiating pain "okay." (R. at 443-44.) An MRI of Mitchell's lumbosacral spine, dated March 16, 2011, showed significant bilateral facet arthropathy at the L4-L5 level with a synovial cyst at the

-12-

right facet joint protruding into the thecal sac. (R. at 423-25.) There also was a bulging annulus and bilateral facet arthropathy, as well as a synovial cyst of the right facet joint impinging on the thecal sac and causing impingement on multiple nerve roots, especially on the right side. (R. at 424-25.) Mild central canal stenosis and moderate bilateral foraminal narrowing were noted at this level, as well. (R. at 425.) At the L2-L3 level, there was a moderate asymmetrically bulging annulus on the left with a small annular tear and facet arthropathy causing moderate left foraminal narrowing. (R. at 425.) Mitchell's dosage of Lortab was increased, and she was referred to a neurosurgeon. (R. at 372.) Dr. Fleenor diagnosed low back syndrome and lumbar disc disease, among other things. (R. at 372.) When Mitchell returned to Dr. Fleenor for the last time on November 19, 2011, he continued to diagnose low back syndrome. (R. at 449.)

While Mitchell treated with other sources, none of the treatment was during the time period relevant to the disability determination. On April 19, 2011, Mitchell saw Dr. David M. Pryputniewicz, M.D,. a neurosurgeon at Blue Ridge Neuroscience Center, P.C., for complaints of right lower extremity pain and lower lumbar pain for the previous two and one-half years. (R. at 404-07.) She reported that the pain changed notably in January 2011 for no specific reason. (R. at 404.) Mitchell advised that she had not undergone any physical therapy or received any epidural steroid injections. (R. at 404.) She reported anxiety and depression. (R. at 405.) Her gait was antalgic to the right, and she ambulated flexed at the waist. (R. at 405.) Mitchell was tender at the right SI joint, but she had no limitation of range of motion of the right lower extremity, and she exhibited full strength and normal tone. (R. at 405.) No atrophy was noted in the right lower extremity. (R. at 405.) She was fully oriented, and her mood and affect were appropriate for her

age and the situation.  (R. at 406.)  After reviewing the March 16, 2011, lumbar spine MRI and the March 15, 2011, hospital admission records, Dr. Pryputniewicz diagnosed Mitchell with a synovial cyst, unspecified; lumbar stenosis at the L4-L5 level; lumbar radiculopathy at the L5 level on the right; and right-sided low back pain, among other things.  (R. at 406.)  He recommended physical therapy and an epidural steroid injection before surgical intervention for the synovial cyst.  (R. at 406.)  Mitchell wished to proceed with surgery.  (R. at 406.)  She was scheduled for physical therapy for three weeks and for a pain clinic evaluation with Dr. William Platt, M.D., for a lumbar epidural steroid injection.  (R. at 406.)

On January 4, 2012, Mitchell saw Dr. Christopher M. Basham, M.D., at Medical Associates of Big Stone Gap, to establish care as a new patient.  (R. at 460-62.)  She complained of chronic lumbar back pain and anxiety.  (R. at 460.)  At that time, Mitchell was taking Cymbalta and Lortab, among other medications.  (R. at 460.)  At the time of the examination, Mitchell noted joint pain and anxiety, but she denied depression and mood changes.  (R. at 460.)  It does not appear that a musculoskeletal or back examination was performed.   Dr. Basham diagnosed hypertension, anxiety, depression and chronic back pain, among other things.  (R. at 461.)  He continued her on her medications, including Cymbalta, and he added Neurontin for pain and anxiety.  (R. at 461.)  Mitchell declined a pain management evaluation.  (R. at 461.)  On January 23, 2012, Dr. Basham ordered a 30-day supply of Lortab for pain management, which he continued on February 28, 2012.  (R. at 457, 459.)

On January 17, 2012, in connection with Mitchell's initial disability claim, Dr. Joseph Duckwall, M.D., a state agency physician, concluded that there was

-14-

insufficient evidence to determine whether Mitchell was disabled prior to December 31, 2007. (R. at 75.) Dr. Duckwall noted that there was no medical or other opinion evidence and that no physical or mental residual functional capacity evaluations were associated with her claim. (R. at 76.) Likewise, on January 23, 2012, Julie Jennings, Ph.D., a state agency psychologist, concluded that no mental medically determinable impairments were established as of the date last insured due to insufficient evidence. (R. at 75.) All of this being the case, the state agency consultants concluded that they could not find Mitchell disabled at any time through December 31, 2007. (R. at 76.)

On May 29, 2012, in connection with the reconsideration of Mitchell's disability claim, Richard Luck, Ph.D., a state agency psychologist, found that there was insufficient evidence to determine the degree to which Mitchell was restricted in the performance of her activities of daily living and in her abilities to maintain social functioning and to maintain concentration, persistence or pace. (R. at 85.) Luck found that Mitchell had experienced no repeated episodes of decompensation of extended duration. (R. at 85.) He concluded that, prior to December 31, 2007, the evidence showed that Mitchell was treated for depression and exposed social anxiety when going outside, but that there was no definitive diagnosis of anxiety contained in the record. (R. at 85.) Instead, the record showed that Mitchell was improving in October 2007 with medication and treatment. (R. at 85.) Luck further noted the lack of a good record of Mitchell's activities of daily living during the appropriate time period. (R. at 85.) Therefore, he found that there was insufficient evidence to fully evaluate Mitchell's mental conditions prior to her date last insured. (R. at 85.) Additionally, James Wickham, another state agency

-15-

consultant,[7] found that the evidence prior to December 31, 2007, showed that Mitchell was being treated for COPD, polycythemia, depression and symptoms of anxiety, but no pulmonary function studies were conducted to fully evaluate her COPD, there was not a full record to evaluate her polycythemia, and there was not a complete record of how Mitchell's depression and anxiety symptoms affected her mental abilities and daily activities. (R. at 87.) All of that being the case, Wickham found that there was insufficient evidence to fully evaluate Mitchell's conditions prior to her date last insured, and he concluded that she could not be deemed disabled. (R. at 87.)

Mitchell saw Dr. Sam Vorkpor, M.D., at Medical Associates of Big Stone Gap on May 30, 2012, for chronic low back pain. (R. at 487-88.) She reported injuring her back a week previously due to prolonged use, prolonged standing and prolonged sitting. (R. at 487.) Mitchell described the pain as severe, sharp, constant and radiating into the right foot. (R. at 487.) Dr. Vorkpor noted no prior injury, but previous MRI findings of herniated disc and synovial cyst. (R. at 487.) Mitchell also complained of anxiety, and previous diagnoses of anxiety and agoraphobia were noted. (R. at 487.) Mitchell was then-currently taking Cymbalta, among other medications. (R. at 487.) Dr. Vorkpor indicated that Mitchell described symptoms consistent with agoraphobia. (R. at 487.) She also complained of depression, but she denied suicidal ideation or planning. (R. at 487.) Mitchell was alert and fully oriented. (R. at 487.) On physical examination, she exhibited abnormal strength and tone, abnormal posture and abnormal gait. (R. at 488.) Dr. Vorkpor diagnosed Mitchell with chronic back pain, anxiety, depression and hypertension. (R. at 488.) He prescribed Neurontin and Lortab.

---

[7] Wickham's professional title is not included in the record.

(R. at 488.)  Mitchell again declined a pain management evaluation.  (R. at 488.)

Mitchell saw Dr. Bryan L. Watson, D.O., at Medical Associates at Big Stone Gap, on January 3, 2013, to establish her care as a new patient.  (R. at 493-95.) She complained of chronic back pain and moderate anxiety with panic attacks.  (R. at 493.)  She described her general health since her last visit as "poor," and she admitted smoking two packs of cigarettes and drinking three alcoholic drinks daily. (R. at 493.)  Mitchell advised that her anxiety symptoms occurred daily.  (R. at 493.)  She reported good medication compliance and fair symptom control.  (R. at 493.)  The note indicates that Mitchell was taking Cymbalta 60 mg and Lortab, as well as other medications, at that time.  (R. at 493.)  She denied a change in sleep pattern, depression, mood changes and suicidal ideation.  (R. at 494.)  Mitchell was cooperative, well-groomed and fully oriented.  (R. at 494.)  On physical examination, she had no edema of the lower extremities, and she exhibited normal muscle strength throughout.  (R. at 494.)  Deep tendon reflexes were +2 bilaterally, and there was no pronator drift.  (R. at 494.)  On musculoskeletal examination, range of motion was intact, and there was no tenderness.  (R. at 494.)  Mitchell had an abnormal gait and station, but Dr. Watson noted that she was in a wheelchair due to back pain.  (R. at 494.)  She had tenderness to the lumbosacral spine.  (R. at 494.)  Dr. Watson diagnosed polycythemia, chronic back pain, hypertension and depression, among other things.  (R. at 495.)  Mitchell's request to return to narcotics was granted, as Dr. Watson noted MRI findings that would cause pain. (R. at 495.)  However, Mitchell refused to see a neurosurgeon.  (R. at 495.)  She was continued on Cymbalta 60 mg.  (R. at 495.)  Mitchell returned to Dr. Watson on July 16, 2013, at which time she rated her back pain as a six on a 10-point scale. (R. at 505.)  She also complained of anxiety, including panic attacks, with

-17-

moderate symptoms occurring daily. (R. at 505.) Nonetheless, she reported good treatment compliance with fair symptom control. (R. at 505.) Mitchell was taking Cymbalta 60 mg, as well as Lortab, at that time. (R. at 505.) She denied claudication, joint pain, muscle cramps and muscle weakness, as well as a change in sleep pattern, depression, mood changes and suicidal ideation. (R. at 506.) Dr. Watson described Mitchell as cooperative, well-groomed and fully oriented. (R. at 506.) She exhibited no edema of the lower extremities, and muscle strength was normal throughout. (R. at 507.) Deep tendon reflexes were +2 bilaterally, and there was no pronator drift. (R. at 507.) A musculoskeletal examination showed intact range of motion without tenderness, but an abnormal gait and station. (R. at 507.) Examination of the spine, ribs and pelvis revealed normal movements without pain and no instability, subluxation or laxity. (R. at 507.) Mitchell did exhibit tenderness in the lumbosacral spine region. (R. at 507.) Dr. Watson diagnosed polycythemia, hypertension, depression and chronic back pain, among other things. (R. at 507-10.) Mitchell refused to see a psychiatrist, despite Dr. Watson's opinion that it was in her best interest to see a mental health professional. (R. at 509.) He continued her on Cymbalta 60 mg. (R. at 509.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether

-18-

she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if she sufficiently explains her rationale and if the record supports her findings.

Mitchell argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to Dr. Fleenor's opinions. (Plaintiff's

-19-

Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.)

After a review of the evidence of record, I find Mitchell's argument unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's disability. 20 C.F.R. § 404.1527(c)(2) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to accord little weight to the opinions of Dr. Fleenor. In October 2011, Dr. Fleenor opined that Mitchell had little to no ability to perform all work-related mental abilities, and in a letter penned the same month, he opined that she had been disabled long before April 1, 2006, and continued to be so, primarily due to her dominating emotional difficulties. At the outset, the court notes that the ultimate disability determination is reserved to the Commissioner. *See* 20. C.F.R. § 404.1527(d)(1) (2015). Therefore, the ALJ is not obligated to grant any special consideration to the opinion of a medical source, even a treating

-20-

physician, that a claimant is disabled. *See* 20 C.F.R. § 404.1527(d)(1). Next, as the ALJ stated in her decision, the highly restrictive limitations as found in the October 2011 mental assessment are not supported by Dr. Fleenor's own treatment notes. The ALJ correctly stated that these notes indicate no acute psychological or mental dysfunction, and they include no recommendations that Mitchell seek additional psychiatric therapy or inpatient mental health treatment. (R. at 21.) Second, as the ALJ stated in her decision, Dr. Fleenor's opinion is not supported by clinical treatment notes, in which Mitchell reported improved psychological symptoms, including lessened depression, good sleep and adequate appetite with no ongoing complaints of serious impairment or dysfunction. (R. at 21.) Specifically, during the relevant time period, Dr. Fleenor diagnosed Mitchell with depression and agoraphobia, which he treated conservatively with Cymbalta. (R. at 290-93.) In August 2006, Mitchell reported that she was agoraphobic, reclusive and hypomanic, but after her dosage of Cymbalta was increased to 60 mg in December 2006, she reported improved depression. (R. at 290, 292.) She again reported doing better in March 2007, and in May 2007 she stated that she "really liked how she felt." (R. at 294.) In both July and October 2007, Mitchell stated that she was doing fair, but she continued to report decreased depressive symptoms. (R. at 296-97.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). These are the sole treatment notes from Dr. Fleenor during the relevant time period.

Dr. Fleenor's treatment notes subsequent to December 31, 2007, also support the ALJ's decision to give his opinion little weight. For instance, in July 2008, Mitchell reported doing fair, and in October 2009, she stated that she was

"alright." (R. at 299, 432.) All of this time, Mitchell was maintained on Cymbalta 60 mg. Dr. Fleenor never referred Mitchell for further mental health evaluation or treatment. When she was treated by Dr. Fleenor at Lonesome Pine in March 2011, she was oriented and cooperative, despite being described as anxious, to varying degrees. (R. at 374, 376, 379.) There are no other treatment notes from Dr. Fleenor prior to his completion of the October 2011 mental assessment and letter to Mitchell's counsel.

As noted by the ALJ, Dr. Fleenor's opinions also are not supported by the other substantial evidence of record. While this other evidence of record is dated subsequent to Mitchell's date last insured, most of it, nonetheless, supports the ALJ's weighing of the evidence. For instance, when she saw Dr. Pryputnewicz in April 2011, she was fully oriented with an appropriate mood and affect, despite her report of anxiety and depression. (R. at 405-06.) When Mitchell saw Dr. Basham in January 2012, she denied depression and mood changes. (R. at 460.) In May 2012, Mitchell was alert and oriented, despite complaints of anxiety with agoraphobic symptoms and depression. (R. at 487.) She denied suicidal ideation or planning. (R. at 487.) In January 2013, Mitchell was cooperative, well-groomed and fully cooperative, despite complaints of moderate daily anxiety, including panic attacks. (R. at 493-94.) She reported fair symptom control with good medication compliance. (R. at 493.) In particular, she denied a change in sleep pattern, depression, mood changes and suicidal ideation. (R. at 494.) Mitchell was treated conservatively with medication throughout this time period. In July 2013, Mitchell was once again cooperative, well-groomed and fully oriented, despite complaints of anxiety. (R. at 505-06.) She continued to report fair symptom control with good treatment compliance. (R. at 505.) At this time,

-22-

Dr. Watson recommended a psychiatric referral, but Mitchell refused. (R. at 509.)

Thus, the medical records subsequent to Mitchell's date last insured evidence that her medical providers continued to treat her mental impairments conservatively with medications, that she reported fair symptom control with good treatment compliance, that she was cooperative and fully oriented and that, when psychiatric treatment was recommended in January 2013, approximately five years subsequent to her date last insured, she declined.

I find that the ALJ's decision to give little weight to Dr. Fleenor's opinions also is supported by the state agency psychologists' conclusions that Mitchell's mental impairments were stable with prescribed medication therapy from September 2003 through March 2007 and that the clinical records indicated that she reported symptom improvement with ongoing treatment with no serious concerns.

With regard to Mitchell's back impairment, there simply is no medical evidence in the record evidencing the existence of a disabling back impairment from April 1, 2006, through December 31, 2007. The first mention of back problems was in September 2008, when Mitchell sought treatment after injuring her back from a fall. Additionally, Dr. Fleenor placed no physical restrictions on Mitchell due to a back impairment. There is no physical assessment contained in the record. The only radiographic evidence is dated from 2008 and 2011, nearly a year and more than three years, respectively, following the expiration of Mitchell's date last insured. Given these circumstances, I find that substantial evidence supports the ALJ's decision to give Dr. Fleenor's opinions little weight.

-23-

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's weighing of the medical evidence. I also find that substantial evidence exists to support the ALJ's finding as to Mitchell's residual functional capacity and her finding that Mitchell was not disabled. An appropriate order and judgment will be entered.

I will deny the plaintiff's request to present oral argument based on my finding that the written arguments adequately address the relevant issues.

ENTERED: January 29, 2016.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-24-